FILED
JEANNE A. NAUGHTON, CLERK
OCT 20 2017
U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY_____DEPUTY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| In Re: | Case No.: | 17-15532-ABA |
|---|---|---|
| Joy R. Denby-Peterson | Chapter: | 13 |
| Debtor. | Judge: | Andrew B. Altenburg, Jr. |

**MEMORANDUM DECISION**

## I.    INTRODUCTION

This court has been asked to decide a dispute between a debtor seeking return of a vehicle that she needs to drive to work and her personal property from inside the vehicle, and the creditor that repossessed it prepetition and refused to return it because it believed that the debtor had surrendered it. The debtor seeks turnover of the vehicle under 11 U.S.C. § 542(a) and damages for violation of the automatic stay under 11 U.S.C. § 362(a)(3).

In applying section 362(a)(3) to the retention of the car postpetition, this court must determine whether the debtor had an interest in the vehicle, an issue of mixed facts and law. After a review of the deficient record and evidence, the compiled facts of this case show that there was not a violation of the automatic stay with regard to the failure of the creditor to return the vehicle. Nevertheless, the vehicle must be returned to the debtor pursuant to section 542 and the debtor may redeem the vehicle through her chapter 13 plan, subject to confirmation requirements.

Regarding the personal property, which the creditor denies having, the court finds it more likely than not that the creditor did not return the property. It must be returned within seven days of the date of that order. As agreed prior to the hearing on the matter, the court will determine the appropriate relief under sections 362 and/or 542 in a separate hearing.

## II.  JURISDICTION AND VENUE

The court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a)(2)(A), (E), (O) and the Standing Order of the United States District Court July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 362(a)(3) and 542(a)(1). Pursuant to Fed. R. Bankr. P. 7052, the court issues the following findings of fact and conclusions of law.

## III.  PROCEDURAL HISTORY

The debtor, Joy R. Denby-Peterson ("Debtor"), filed an emergency petition under chapter 13 of the Bankruptcy Code on March 21, 2017. Three days later she filed a Motion for Return of Repossessed Auto[1] and for Sanctions for Violation of Automatic Stay against Pine Valley Motors ("Pine Valley") on shortened time. Doc. Nos. 5, 6. Pine Valley filed opposition on April 3, 2017. Doc. No. 17. At the hearing held April 4, 2017, the parties agreed that a plenary hearing was necessary. The court also ordered Pine Valley to return the Debtor's personal property that day. The court scheduled the plenary hearing for April 13, 2017, but it was adjourned at the request of the parties to May 12, 2017. On May 11, 2017, the court held a telephonic hearing where, on request of the Debtor, the plenary hearing was again adjourned, to a date to be determined, to allow discovery to be completed. The court instructed Pine Valley not to dispose, use, sell, lease, or otherwise transfer possession or ownership of the vehicle pending final resolution of the Debtor's motion. On August 7, 2017, the parties filed a Joint Statement of Undisputed Material Facts. Doc. No. 42 ("JS"). Finally, a plenary hearing was commenced on August 16, 2017 and concluded on August 17, 2017. The court having received the parties' post-hearing briefs, this matter is now ripe for disposition.

## IV.  FINDINGS OF FACT

Preliminarily, the court notes that it had difficulty determining the facts in this case as the parties presented very different stories through unconvincing testimony of unbelievable witnesses,

---

[1] Some courts state that enforcement of this turnover right must be sought by adversary proceeding, citing Federal Rule of Bankruptcy Procedure 7001(1). Rule 7001(1) provides that an adversary proceeding is required in "a proceeding to recover money or property . . . ." While it seems clear that this would then apply to actions brought under section 550(a), providing for a trustee to "*recover*, for the benefit of the estate, the property transferred," it is not so clear that it also applies to turnover of property of the estate. *See Chapter 13 Practice & Procedure*, § 15:12 (ed. Drake, Bonapfel, Goodman, June 2017) (stating though technically a request for immediate turnover requires an adversary proceeding, Fed. R. Bankr. P. 7065, 7001(7), courts "traditionally" have treated violation of the stay as contempt that may be sought by motion). But the creditors here waived the procedures, and both parties exercised their discovery rights without issue. *See In re Pluta*, 200 B.R. 740, 741, n. 1 (Bankr. D. Mass. 1996) (stating that turnover should have been brought by complaint, but that the defect is waivable and the respondent did not raise it).

focusing on issues the court did not find relevant.[2] But based on the shifting burdens, some testimony against interest, and what it hopes is sound reasoning, the court has constructed what it believes most likely occurred. At the damages phase of this contested matter, the parties will be estopped from challenging any of the findings of fact made here.

The Debtor is a practical nurse who primarily earns income on an independent contractor basis. 1T, at p. 15, 45.[3] She is contracted out to "different facilities," such as the correctional system, and rehabilitation and long term care facilities. *Id.* She attends to patients throughout New Jersey. *Id.*, at pp. 15, 43.

Pine Valley and NU2U Auto World ("NU2U") (collectively, "the Creditors") are car dealerships that offer "buy here, pay here" financing services. JS, at ¶ 8. Anthony Pinto and Kenneth Cohen are informal partners agreeing to equally share in ownership of Pine Valley. 2T, at pp. 10, 109. Mr. Cohen owns NU2U, a limited liability company. 2T, at p. 10. Pine Valley routinely accepts installment sales payments on behalf of NU2U. JS, at ¶ 9. The two companies share the same computer system. 2T, at p. 41. Any employee can go into the computer system to authorize a repossession. 2T, at p. 140-41.

Mr. Pinto is the "primary" employee at Pine Valley. 2T, at p. 11. There is only one other employee there, but sometimes NU2U employees will help out. 2T, at p. 11. Similarly, Mr. Pinto is not employed by NU2U, but "helps out" there sometimes, using its mechanic, and going to auctions with its employees. 2T, at p. 140.

The Debtor testified that after her Mercedes was destroyed in a flash flood on July 1, 2016 she went to Pine Valley to purchase a "new" used car. 1T, at pp. 39, 43, 46. She had met Mr. Pinto three to five years prior and "had continuously told him [she] wanted a Corvette." 1T, at p. 43. *See* 1 T, at pp. 46, 115. On July 21, 2016, the Debtor and Pine Valley entered into a Buyer's Order whereby the Debtor bought and Pine Valley sold a yellow 2008 Chevrolet Corvette (the "Vehicle"). JS, at ¶¶ 1, 2. The parties entered into a Precomputed Retail Installment Contract (the "Contract") dated July 21, 2016, to supply financing to the Debtor through Pine Valley. JS, at ¶ 3; ex. D-2. Pine Valley simultaneously assigned the Contract to NU2U. JS, at ¶ 7; ex. D-2. The total to be paid by the Debtor was $53,382.33.

The Contract required a $3,000 down payment and then a "deferred down payment" of $2,491 to pay taxes and obtain permanent license plate tags ("taxes and tags") to be paid by August 11, 2016. JS, at ¶ 4; ex. D-2.[4] The Creditors retained full responsibility for processing this through

---

[2] For example, the parties spent much time at the hearing trying to prove when the vehicle was repossessed, February or March, presumably to prove whether the Waiver, dated in February, was legitimate. Yet both failed to submit conclusive evidence and the court certainly did not find the testimony of the Debtor, Mr. Cohen, Mr. Pinto or Henry Thai helpful. But, where was the tow truck driver? The Debtor had deposed the driver, but did not make her available for trial. The driver was the agent of Pine Valley, but Pine Valley also did not produce her for trial, or, in her absence, produce her partner or authenticated documentary evidence. Nevertheless, as will be explained later, the date of the repossession was not necessary to disposition.

[3] Citation to the transcripts will be denoted by 1T for the August 16th testimony and 2T for the August 17th testimony.

[4] Examination of the Contract's itemization reveals that $391.50 of the $2,491.15 may have been financed. The disclosed amount financed of $26,995.00 consists of the cash price of $26,603.50 plus a $144.50 title fee plus a $250.00 documentary fee. These fees added to the $2,099.95 sales tax equal $2,491.50. If they were not part of the

the Department of Motor Vehicles. 1T, at p. 146. The Contract also required regular weekly payments of $200 beginning July 29, 2016 for 212 weeks, with a payment in week 213 of $0.03. Ex. D-2. Mr. Pinto testified that the interest rate was also 23.99 percent. 2T, at p. 110. Every customer who finances a vehicle through Pine Valley is charged that rate. *Id.* The Contract designated that the sale was a "consumer creditor contract" with the Vehicle being for "Personal, Family or Household Use." Ex. D-2, at ¶¶ 32, 3. Regarding repossession, the Contract provided that "Personal property found in the vehicle will be stored at your expense and may be returned to you if you identify it. We will dispose of such property after we have given you any notice and time to recover it that the law requires." Ex. D-2, at ¶ 17. Mr. Pinto was completely unaware of this provision. 1T, at 114.

Another document signed by the Debtor and Mr. Pinto provided that if the Debtor failed to pay the taxes and tags balance within the allotted temporary tag time, then the Creditors would apply all regular Vehicle payments toward the taxes and tags until they were paid in full. Ex. D-4. Pine Valley recommended in this document that payments be made on the deferred down payment "so it is not all due at one time." *Id.* Pine Valley warned that if this deferred down payment was not paid in full by the due date, then the Vehicle would be subject to repossession. *Id.* It also warned that it would be illegal for the Debtor to drive the Vehicle until she received her plates. *Id.* It stated that additional fees would apply "after 14 days," *id.*, but nowhere is it specified what these fees would be. A document titled "Pick-Up Note Acknowledgement," initialed by the Debtor, also stated that she owed one deferred payment of $2,491, due on August 11, 2016. Ex. C-2.

Between July 21, 2016 and February 16, 2017, the Debtor made payments totaling $9,200 under the Contract, including the $3,000 down payment applied on the day of the sale. JS, at ¶ 10. She did not make the lump sum payment of $2,491 on August 11, 2016, or ever make a $2,491 lump sum payment. JS, at ¶ 6. She testified that she did not know about the $2,491 payment requirement until she visited Pine Valley about a month after purchasing the vehicle to ask when she would receive her permanent tags. 1T, at pp. 18-19. She did not read any documents at the time she signed them. 1T, at pp. 19, 43, 49-51, 63, 74. She testified that she was not given copies of the documents she signed. 1T, at pp. 19-20, 75.

The Creditors applied $3,000 of the Debtor's payments to the down payment and $5,700 of regular payments to installment payments due under the Contract. JS, at ¶ 11, ex. D-3. They also applied $400 of her regular payments to taxes and tags on September 16, 2016 and $100 to taxes and tags on January 18, 2017. Ex. D-3. Reviewing the transaction history, the Debtor made payments over 28 weeks.[5] In week 7, her payments exceeded the $200 a week she owed, with her having paid $800 extra by week 28, excluding the deferred down payment. Therefore, at a minimum the Creditors should have applied $800 to the deferred down payment. Consequently, by not applying all of the Debtor's payments first to the taxes and tags, the Creditors breached their contract with the Debtor that provided that all regular Vehicle payments would be applied to

---

amount financed, then the Truth-in-Lending ("TILA") Disclosure may have been inaccurate. These inaccuracies lend support to questioning the credibility of Messrs. Pinto and Cohen.

[5] The Transaction History, ex. D-3, only lists 14 due dates, representing the dates the Debtor was paid through. 1T, at p. 121. For example, Mr. Pinto testified that on October 7, 2016, the Debtor's payments only caught her up to her September 16, 2016 amount due. 1T, at p. 122. There were actually 28 weeks between the first payment on July 21, 2016 and the last on February 26, 2017.

the taxes and tags until that amount was paid in full, Ex. D-4, and left the Debtor without title and valid tags.

Mr. Pinto testified that "she just pleaded with me to please put them towards the car so the car wouldn't get repossessed[,]" but then stated "or it's just a mistake on my part[,]" and then changed to "I think it was just me, I was going to take the rap for it if something – you know, if I got in trouble for it." 1T, at 112. Mr. Cohen stated that this language about applying first to taxes and tags "until it is paid in full" which may result in the car being repossessed, and that it is illegal to drive the car until the plates are received, is just "to scare someone to do the right thing," i.e., "to pay their payments and pay their tax and tags." 2T, at p. 22. The Vehicle was never titled or registered in the name of the Debtor. JS, ¶ 12. She drove the Vehicle with temporary tags. 1T, at p. 18, even after their expiration. 1T, at p. 83.

The Debtor was evasive regarding whether she was ever in default, testifying only that "perhaps" she sometimes paid late, 1T, at p. 21, and that nobody ever told her that she was behind. 1T, at pp. 68, 70. But she did admit that after a radiator repair cost more than Mr. Pinto had estimated, she advised him that her next payment would be late and that he agreed to that. 1T, at pp. 23, 68.[6]

The Debtor paid for repairs on the Vehicle at least twice. One concerned the radiator, mentioned above. After speaking with Mr. Pinto, she was convinced to have "his guy" repair it rather than take the Vehicle to a dealership. 1T, at p. 22. She claimed that Mr. Pinto quoted her $200 and that a dealership would charge her $800. *Id.* After the repair cost $534, ex. D-12, she complained to Mr. Pinto and, as stated above, explained that her next Vehicle payment would be late. 1T, at p. 23. She also had a repair done to the passenger door that was misaligned and ripping the framing. 1T, at p. 24. A scratch on the Vehicle, 1T, at p. 25, may have been repaired at the same time. The repair cost at least $1,756. Ex. D-13.

Mr. Cohen met the Debtor after she had the radiator replaced at NU2U's mechanic and it cost more than Mr. Pinto had led her to expect. 1T, at p. 22; 2T, at p. 15. Mr. Cohen testified that she yelled at him in the showroom. 2T, at p. 15. She initially left without paying, but then returned and paid. 2T, at p. 16.

The parties dispute what date the Vehicle was repossessed. The Debtor contends she discovered the Vehicle missing on the morning of March 13, 2017. 1T, at p. 26. She recalls the date because she was starting a new job that morning. 1T, at pp. 25-26. She also alleges that she called and texted Mr. Pinto complaining that her Vehicle was gone. 1T, at pp. 26-27.

The Creditors argue that the Vehicle was repossessed in February 2017. While Mr. Pinto recalls the Debtor calling him about the Vehicle being repossessed, he insists that it was on February 19, 2016. 1T, at p. 128. He does not recall what time of day she called. *Id.* He testified that a few days after the Vehicle was repossessed, the Debtor came in and signed a waiver document. 1T, at pp. 129-130. Mr. Pinto contends that the Debtor signed this document at that

---

[6] When she discovered the Vehicle gone from her driveway, she texted Mr. Pinto that "I told you I was going to be late." 1T, at p. 27; ex. D-10. Thus the court does not understand why she was so imprecise on the stand about whether she ever was in default.

time, collected her personal belongings from the Vehicle, and left. 1T, at pp. 130-131. That document states:

> To Whom It May Concern,
>
> Notice is given that the debtor under the security agreement dated 07/21/2016, in which Pine Valley Motors is the secured party for the performance of which 2008 Chevrolet Corvette [VIN] was given to secure the performance agreement. Debtor acknowledges (his/her/its) default under the security agreement and waives all rights to Notification of Disposition of the collateral under section 12A:9-611 of the New Jersey Uniform Commercial Code and rights to redeem the collateral, whether those rights arise under the security agreement or pursuant to Section 12A:9-623 of the New Jersey Uniform Commercial Code.

Ex. D-11, p. 17-2 (the "Waiver"). The document is a form that that Pine Valley then runs through a printer to add its name, address and phone numbers, the date, the subject car and its VIN, the date of the security agreement, and the debtor's name. 1T, at pp. 131-32. Thus Pine Valley has the capability of having a buyer sign the document in blank and later running it through a printer to add the particulars, including the date.

Not only does the Debtor not recall ever signing the Waiver document, she swears she did not get her personal belongings back. She testified that she likes to pack her car up ahead of time when starting a new job assignment. 1T, at p. 28. Prior to the repossession, she alleges she had in the car her school books, her nursing licenses from three states, her medical information, her bank debit card, $750 in cash, prescription eyeglasses, her high school diploma and her nursing diploma, but not her purse. 1T, at pp. 28, 76. She testified that she packed the Vehicle up on Saturday, March 11 for a job that began on Monday, March 13. 1T, at p. 55. She entered into evidence a copy of her replacement Social Security card that was reissued April 11, 2017, and testified that she obtained a copy of her driver's license on April 6, 2017. *See* 1T, at pp. 33-34; ex. D-15. She additionally testified that a few days after her Vehicle was repossessed, her bank account was hacked into, with over $10,000 stolen. 1T, at p. 66.

The Debtor testified that the first time she went to Pine Valley after the repossession, Mr. Pinto told her she had to pay $530 to get her personal property back. 1T, at p. 29. The second time was after this bankruptcy case was filed and she was directed to return to Pine Valley to collect her belongings. 1T, at pp. 29-30. She testified that it cost her $120 round trip to take a cab there. 1T, at p. 30. She says that Mr. Pinto told her that the Vehicle was not there and that she had already gotten her belongings back. 1T, at pp. 30-31.[7]

The court believes it is more likely than not that the Debtor did not get her personal property back. While the court finds it hard to believe that someone would leave valuables such as the

---

[7] The court finds it troubling that the Creditors would allow the Debtor to waste time and money on a trip to their facility to recover the personal property when they subsequently took the position that they were not in possession of the personal property. Everyone in the courtroom that day was aware that the Debtor was going to make that trip but NO ONE from the Creditors side cautioned the Debtor or her counsel that the personal property was allegedly not in their possession. It shows a lack of candor to the court and the Debtor.

Debtor did in a car for two nights, and at times might find someone claiming to act in a palpably unreasonable manner as lying, not everyone acts reasonably. Weighed against the testimony of the Creditors on the subject, the court finds their positions less believable.

For example, Mr. Cohen testified,

> . . . [U]sually what we do is, because of the cost of keys nowadays, everybody always wants their stuff out of the car, so we offer, if you bring up your key, you can then get your stuff out of the car.

2T, at p. 25. If the customer does not bring back the key, then

> Their stuff goes into storage, and in the event we decide to sue them, they can then deal with the storage company to get their stuff out. We sue them for the balance of the money. But we do hold everybody's stuff for at least 30 days before it goes into storage.

2T, at p. 26.

Despite referring to a storage company, on further questioning Mr. Cohen revealed that storage is actually a trailer on the property with a lock on it. 2T, at p. 44. Though he admitted that if the buyer does not give back the key, "I believe it's a civil matter, but most of the time they get their belongings anyway, because it's usually not very expensive cars. But if it is an expensive car, we kind of push the issue that we'll bring your car back. . . ." 2T, at p. 44. If they don't return the key, then he has to get a key cut for the car. 2T, at p. 45. But as for their possessions, "I say how about this, it's something fair. Bring up the key, I'll give you your possessions. If I had already made a key, then I just give them their possessions because it doesn't benefit me." 2T, at p. 45.

Mr. Pinto testified that the Debtor returned the key after she got her personal property. 1T, at p. 143. "I'm pretty sure she left it right on my desk." 2T, at p. 143. But he had testified at a deposition that he did not know whether the Debtor retrieved her personal property, whether there was any property to retrieve, and that he never saw the Vehicle again. 1T, at p.136.

In addition, Mr. Pinto testified that "typically" he has customers sign a piece of paper saying that they picked up their personal property. 1T, at p. 144. But when asked whether he did so with the Debtor, he prevaricated "I mean, again, every situation is different. I mean this [the Waiver] is what I printed out at the time, that she was kind of done with the car. You know, give us the key, take your stuff out, you know." 1T, at p. 145.

To summarize, the Creditors pressure buyers into returning the Vehicle key by withholding access to the Vehicle to collect their belongings. They say they have buyers sign a receipt acknowledging return of the belongings, but the Creditors did not follow their usual procedures and have the Debtor do so in this case. Mr. Pinto testified inconsistently about whether the Debtor had retrieved her property. There was no evidence submitted that reflected a return of the personal property. There was animosity between these parties, such that the court can believe that the Creditors would act vengefully toward the Debtor. Finally, the Debtor produced a key at the hearing with a Corvette logo on it, which was examined by the Creditors, while the Creditors did not produce a key. While this alone is not solid evidence that this was the key to the Vehicle, the court finds it is more likely than not the key to the Vehicle.

Finally, as stated above, the Debtor filed her bankruptcy case on March 21, 2017. Pine Valley received notice of the filing on March 23, 2017. JS, at ¶ 13. The following day, the Debtor filed the motion now before the court. She filed a plan proposing to cure and reinstate the Vehicle. Doc. No. 13. NU2U filed a proof of claim in the amount of $28,773. Ex. D-8.

## V.    CONCLUSIONS OF LAW

The Debtor seeks turnover of the Vehicle and sanctions for violation of the automatic stay. The court first addresses whether she has a right to turnover.

### A. Turnover

Section 363(b) permits a trustee "after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate. . ." and section 363(d) allows a trustee to use, sell or lease section 363(b) property to the extent not inconsistent with any relief granted under section 362(c), (d), (e) or (f). 11 U.S.C. §§ 363(b), (d). In turn, section 542(a) provides that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). Property of the estate includes "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). *See Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001).

In chapter 13, the debtor, not the trustee, has standing under section 542(a). *In re Sharon*, 234 B.R. 676, 687 (B.A.P. 6th Cir. 1999) ("To the extent a Chapter 13 debtor can then use property of the estate under § 363, the debtor succeeds to the mandate in § 542(a) that compels delivery of property that is usable under § 363."). *See In re Dash*, 267 B.R. 915, 917 (Bankr. D.N.J. 2001) (tracing section 1303 to sections 363(b) and 542(a)). *See also In re McCann*, 537 B.R. 172, 178 n. 3 (Bankr. S.D.N.Y. 2015) (chapter 13 debtors have the right to use non-business property without prior court approval); *In re Laflamme*, 397 B.R. 194, 205 (Bankr. D.N.H. 2008); *Collier on Bankruptcy*, ¶ 1303.02 (Matthew Bender 2017) ("Congress apparently felt that there was no need to explicitly state the right of a nonbusiness chapter 13 debtor to use property in the ordinary course of the debtor's affairs, since section 1306(b) expressly authorizes the chapter 13 debtor to retain possession of all property of the estate.").[8]

Thus, as a chapter 13 debtor, the Debtor had the right to request turnover of property that she could use, sell or lease. The Creditors should have returned her personal property when she asked for it on April 4. They provided no legal basis for retaining it. Alternatively, if they threw

---

[8] For ease of reading, where in this opinion the court references a debtor's right to turnover, it means a chapter 13 debtor's right. In chapter 7, the turnover right belongs to the trustee.

out her property, then they breached their contract that requires them to give a buyer notice prior to disposal.

As for the Vehicle, the Creditors argue that it was not titled in the Debtor's name, she also surrendered the Vehicle, and there was no insurance on the Vehicle.

The question becomes, what was the Debtor's interest in the Vehicle at the time of filing?

### i. Equitable interest in the Vehicle

Several bankruptcy courts have recognized that beneficial or equitable ownership may trump legal title for purposes of property of the estate where the applicable state law so provides. *See In re DuFoe*, 392 B.R. 534, 539 (Bankr. W.D.N.Y. 2008) (rebuttable presumption under New York's Vehicle and Traffic Law that one other than the title owner can be the beneficial or equitable owner of a vehicle); *In re Groves*, 05-76317, 2006 WL 6211798, at *5 (Bankr. N.D. Ohio Apr. 13, 2006) (vehicle not property of the estate where debtor held legal title only in vehicle solely for the benefit of her son); *In re Garberding*, 338 B.R. 463 (Bankr. D. Colo. 2005) (presumption of ownership rebutted by title owner's boyfriend who made all payments, paid for insurance and maintenance, and was the exclusive driver). *But see In re Kirk*, 381 B.R. 800, 802 (Bankr. M.D. Fla. 2007) (debtor failed to rebut presumption that she had no legal or beneficial interest in vehicle titled in her and her daughter's name, purchased by daughter's grandfather for and driven solely by her daughter, but with insurance and maintenance paid for by the debtor). *See also In re Moore*, 448 B.R. 93, 100 (Bankr. N.D. Ga. 2011) (where debtors pawned vehicles, but still retained right to possession, legal title, beneficial ownership interest subject to automatic divestment, and the right to maintain possession and redeem, vehicles were property of the estate at the time of the filing of the case).

New Jersey courts have granted in insurance coverage cases that "there may be more than one 'owner' of a vehicle." *Verriest v. INA Underwriters Ins. Co.*, 142 N.J. 401, 408 (1995). In so deciding *Verriest*, the New Jersey Supreme Court cited with approval *Am. Hardware Mut. Ins. Co. v. Muller*, 98 N.J. Super. 119, 236 A.2d 182 (1967), *aff'd*, 103 N.J. Super. 9, 246 A.2d 493 (1968), a case where, in order to obtain financing, legal title of a vehicle was placed in the name of David Muller, but his father, Ernest, made the payments on, used, and maintained the vehicle, and Ernest purchased the subject insurance in his name. *See Muller*, 98 N.J. Super. at 122. The *Muller* court held that title papers, which are synonymous with certificate of ownership, were evidence of ownership of a vehicle, but not conclusive evidence. *Id.*, at 128. For purposes of insurance coverage, it decided the car was owned by Ernest.

In so holding, the *Verriest* court considered the factors listed in a case decided by the Supreme Court of Washington:

> (a) Who paid for the car, (b) who had the right to control the use of the car, (c) the intent of the parties who bought and sold the car, (d) the intent of the parents and the child relative to ownership, (e) to whom did the seller make delivery of the car, (f) who exercised property rights in the car from the date of its purchase to the date of the accident, and (g) any other circumstantial evidence [that] may tend to establish the fact of ownership.

*Verriest*, at 409-10 (citing *Coffman v. McFadden*, 68 Wash.2d 954, 416 P.2d 99, 102 (1966)).

Another New Jersey court, also citing *Muller*, commented that this deviation from title ownership is appropriate to find that the insurance policy covers the actual user of the vehicle—the beneficial owner—rather than one who is merely a title owner. *Friedman v. Royal Globe Ins. Companies*, 137 N.J. Super. 192, 197 (Law. Div. 1975). *See Dobrolowski v. R.C. Chevrolet, Inc.*, 227 N.J. Super. 412, 415 (Law. Div. 1988) ("The owner of the vehicle is usually the person who holds the title and in whose name the vehicle is registered, but this is not always the case."). The Third Circuit has also extended this idea to stock ownership. *See Yonadi v. C.I.R.*, 21 F.3d 1292, 1298 (3d Cir. 1994) (citing *Muller* in holding that "New Jersey law does not require strict compliance with the formalities of stock ownership registration in order to recognize ownership interest.").

Thus it was not a reach for our sister court in applying New Jersey law to extend *Muller* to the bankruptcy context. There, the court held that vehicles registered in employees' names but used for the benefit of the corporate debtor, with loan payments made by the corporate debtor, were owned by the debtor for purposes of property of the estate. *In re B & P Distributors, Inc.*, 1 B.R. 426, 427 (Bankr. E.D. Pa. 1979). "Under New Jersey law, the certificate of title is not the sole determinant of ownership. It creates only a rebuttable presumption of ownership." *Id.*, at 427. *Accord In re Potter's Landscape Nursery, Inc.*, 44 B.R. 198 (Bankr. E.D. Pa. 1984).

Building on *Muller, B & P* and *Potter's Landscape*, the court *In re Rutledge*, 115 B.R. 344, 346 (Bankr. N.D. Ala. 1990), *aff'd sub nom. Matter of Rutledge*, 121 B.R. 609 (N.D. Ala. 1990), also found equitable ownership in a vehicle for purposes of determining whether it was property of the estate and subject to a turnover order. There the debtor had made all payments, made a down-payment, transferred title on a trade-in car to the creditor, placed insurance on the car in her name with the creditor as loss-payee, negotiated a refinancing of the car with the creditor, and remained in possession of the car, even though the car had been purchased under her father's credit and was titled in his name. *Id.*

Here, Mr. Pinto admitted that the Debtor "definitely purchased the car, absolutely." 1T, at p. 114. The Debtor possessed, made weekly payments on, and maintained the Vehicle. She made costly repairs. She exercised all rights to it up until its repossession. Though she did not have legal title, Mr. Pinto admitted that paying the taxes and obtaining the tags were the sole responsibility of the Creditors. Without question, the Debtor had an equitable ownership in the Vehicle.

More importantly, the fact that the taxes and tags had not been obtained in this case was solely the Creditors' fault and actually a breach of its contract. The Creditors failed to obtain title in the Debtor's name despite that the Debtor made more than enough regular Vehicle payments to cover this cost. If the Creditors had done what they were contractually required to do, at the time of the repossession the Vehicle would have been titled in the Debtor's name, establishing her as the actual legal owner. It seems a proper remedy for the Creditors' breach of contract would be to return the parties to their positions prior to the breach. *Petron Scientech, Inc. v. Zapletal*, 16-1091, 2017 WL 2992079, at *3 (3d Cir. July 14, 2017) (citing *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 860 A.2d 435, 442 (2004)) and *Marina Dist. Dev. Co., LLC v. Ivey*, 223 F. Supp. 3d 216, 221 (D.N.J. 2016) (citing *Totaro, Duffy, Cannova and Company, L.L.C. v. Lane, Middleton & Company, L.L.C.*, 191 N.J. 1, 921 A.2d 1100, 1107 (2007)).

Accordingly, this court finds that the Debtor, at minimum, had an equitable interest in, if not was, the equitable owner of the Vehicle at the time of the bankruptcy filing. Because of that equitable interest/ownership, upon the filing of her petition, the Vehicle was property of the estate under section 541(a)(1) that she could use and thus request turnover from the Creditors.

### ii. Surrender of the Vehicle

The court makes this finding despite the Creditors' argument that the Debtor surrendered the Vehicle to it prepetition. The court acknowledges that the parties debated when or even if the Debtor signed the Waiver. Regardless, for several reasons, the Waiver does not serve to exclude the Vehicle from property of the estate.

The first is the most obvious. Nowhere in the Waiver does the word "surrender" appear. It acknowledges a default and waives notice and a right to redeem, but nowhere does it state the Debtor surrendered the Vehicle. Therefore, there is no surrender to rebut her equitable interest in the Vehicle.

More importantly, the purported waiver of a right to redeem is invalid as New Jersey's Commercial Code prohibits waiver of a right of redemption in these circumstances. The Waiver purports to have the Debtor waive her rights under New Jersey's Commercial Code sections 12A:9-611 and 12A:9-623. Section 610 of New Jersey's Commercial Code provides that, "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." N.J.S.A. 12A:9-610. Section 9-611 then provides that the secured party must send notice of disposition of the collateral to the Debtor. N.J.S.A. 12A:9-611(b). Section 9-623 permits a debtor to redeem collateral, N.J.S.A. 12A:9-623(a), "at any time" before the creditor:

- has collected collateral under 12A:9-607[9]
- has disposed of collateral or entered into a contract for its disposition, or
- has accepted collateral in full or partial satisfaction of the obligation it secures.

N.J.S.A. 12A:9-623(c)(1)-(3) (amended eff. Jan. 8, 2002).[10]

---

[9] "Collection" appears to refer to liquid assets. See Uniform Commercial Code Comment 2 to N.J.S.A. 12A:9-607 ("Collateral consisting of rights to payment is not only the most liquid asset of a typical debtor's business but also is property that may be collected without any interruption of the debtor's business. . . . This section allows the assignee to liquidate collateral by collecting whatever may become due on the collateral, whether or not the method of collection contemplated by the security arrangement before default was direct (i.e., payment by the account debtor to the assignee, "notification" financing) or indirect (i.e., payment by the account debtor to the assignor, "nonnotification" financing)."). See, e.g. Major's Furniture Mart, Inc. v. Castle Credit Corp., 602 F.2d 538, 542 (3d Cir. 1979) (applying UCC § 9-502, the precursor to § 9-607). See also In re Herbst, 469 B.R. 299, 304 (Bankr. W.D. Wis. 2012 ("The phrase "collection of collateral" under Revised U.C.C. § 9-623 is new but the listing is apparently a clarification, rather than a substantive change. 1 Secured Transactions Under the Uniform Commercial Code, § 8.16[2] (Matthew Bender 2012)."). Certainly, Creditors cannot claim they collected their collateral in accordance with 12A:9-607.

[10] Notably, there is no 30-day deadline. The court does not know why Mr. Cohen believes he may re-sell vehicles after 30 days. See 2T, at p. 36.

The Creditors assert that by signing the Waiver, the Debtor waived her right to redeem and to notice of disposition of the collateral. But while the Commercial Code provides for waiver of the right to redeem collateral, it specifically excepts consumer-goods transactions from the waiver right:

> (c) Waiver of redemption right. Except in a consumer-goods transaction, a debtor or secondary obligor may waive the right to redeem collateral under 12A:9-623 only by an agreement to that effect entered into and authenticated after default.

N.J.S.A. 12A:9-624(c).

Under the Commercial Code, a consumer transaction is one in which "(i) an individual incurs an obligation primarily for personal, family, or household purposes, (ii) a security interest secures the obligation, and (iii) the collateral is held or acquired primarily for personal, family, or household purposes." N.J.S.A. 12A:9-102.

Clearly this Vehicle was purchased for personal use. Indeed, the Contract specifically designated the Vehicle as for "personal, family or household use" and states that the agreement is a "consumer credit contract." Accordingly, regardless of if or when the Debtor signed the Waiver, it was invalid under New Jersey law. Thus, not only did the Debtor not surrender the Vehicle by signing the Waiver, she did not waive her right to redeem it.

And as the Creditors had neither collected, disposed of, entered into a contract for disposition, or accepted the collateral in full or partial satisfaction of the obligation prior to the filing of the bankruptcy petition—NU2U's filing of a proof of claim in the amount of $28,773 negates any suggestion that it accepted the collateral in full or partial satisfaction of the obligation, see ex. D- 8— the debtor's right to redeem remains.[11]

Thus, not only did the Debtor have a right to request turnover of the Vehicle as an equitable owner of the Vehicle, the "Waiver" is invalid and her right to redeem remained in place at the time of her bankruptcy filing. Her right to redeem also represents an equitable interest that became property of the estate under section 541(a)(1) upon filing her petition.

### B. Automatic stay

Having established that the interest in the Vehicle and right to redeem are property of the estate, the court now turns to whether the Creditors violated the stay by refusing turnover of the Vehicle and/or the personal possessions. This raises an issue of the interaction between sections 542(a), 363(e) and 362(a)(3): turnover, adequate protection, and the automatic stay.

Section 542(a) was discussed above. Section 363(e) provides:

---

[11] The court was aware going into the plenary hearing of this invalidity, as sections 611 and 623 are cited in the Waiver itself. It was pleased that the Debtor in her post-trial brief also picked up on the issue.

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(e).

Courts analyzing whether a failure to turn over property violates the automatic stay consider section 362(a)(3), which provides:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of— .
>
> . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. . . .

11 U.S.C. § 362(a)(3).

Congress added "or to exercise control" to section 362(a)(3) by the Bankruptcy Amendments and Federal Judgeship Act of 1984, *In re Sharon*, 200 B.R. at 187, without explanation. *In re Young*, 193 B.R. at 623; *In re Sw. Equip. Rental, Inc.*, 1-88-00033, 1990 WL 129972, at *3 (Bankr. E.D. Tenn. Feb. 8, 1990). The meaning of that phrase, "to exercise control," is the subject of a circuit split made more challenging by the absence of any legislative history on the amendment, *see In re Sw. Equip. Rental, Inc.*, 1-88-00033, 1990 WL 129972, at *3 (Bankr. E.D. Tenn. Feb. 8, 1990), to explain Congress's intent.

Four circuit courts of appeal have held that section 542(a) requires immediate turnover of property that the debtor can use, and that failure to do so violates section 362(a)(3)'s "to exercise control" provision. *Weber v. SEFCU (In re Weber)*, 719 F.3d 72, 82 (2d Cir. 2013); *Thompson v. General Motors Acceptance Corp., LLC (In re Thompson)*, 566 F.3d 699, 703 (7th Cir. 2009); *California Employment Dev. Dept. v. Taxel (In re Del Mission Ltd.)*, 98 F.3d 1147, 1151-52 (9th Cir. 1996); *Knaus v. Concordia Lumber Co., Inc. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989). *See also TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 682 (B.A.P. 6th Cir. 1999); *In re Colortran, Inc.*, 210 B.R. 823, 827 (B.A.P. 9th Cir. 1997), *aff'd in part, vacated in part on other grounds*, 165 F.3d 35 (9th Cir. 1998). Some courts additionally hold that this pertains even if the secured creditor is not adequately protected, relief that it must separately petition the court for. *Weber*, 719 F.3d at 81-82; *Thompson*, 566 F.3d at 708; *Sharon*, 234 B.R. at 683; *Colortran*, 210 B.R. at 827.

Two circuit courts of appeal have instead held that a creditor does not violate the stay in regard to property of the estate if it merely maintains the status quo. *In re Cowen*, 849 F.3d 943 (10th Cir. 2017); *U.S. v. Inslaw*, 932 F.2d 1467 (D.C. Cir. 1991). These courts and those following them emphasize that 362(a)(3)'s language, "an act . . . to exercise control," is forward-looking, and thus a creditor must take some new, postpetition action to exercise control over the property of the estate in order to violate the stay. *In re Cowen*, 849 F.3d 943, 949 (10th Cir. 2017) ("This

section, then, stays entities from *doing* something to obtain possession of or to exercise control over the estate's property. It does not cover 'the act of passively holding onto an asset,' *Thompson*, 566 F.3d at 703, nor does it impose an affirmative obligation to turnover property to the estate.") (emphasis in original); *United States v. Inslaw, Inc.*, 932 at 1474 ("The statutory language makes clear that the stay applies only to acts taken *after* the petition is filed."); *In re Hall*, 502 B.R. 650, 665 (Bankr. D.D.C. 2014) ("[T]he 'act . . . to exercise control' language itself suggests that an affirmative act of exercising control is required."); *In re APF Co.*, 274 B.R. 408 (Bankr. D. Del. 2001) (J. Walsh) (". . . Plaintiffs must show that NYLCare engaged in conduct which was an affirmative post-petition act manifesting either an exercise of control over property of the estate, or collecting, assessing or recovering such property in order to demonstrate a stay violation."); *In re Young*, 193 B.R. 620, 629 (Bankr. D.D.C. 1996) (". . . the stay is intended only to *prohibit* postpetition affirmative acts by creditors and thus acts as a freeze of the status quo at petition.").

These *status quo* courts read sections 542(a) and 363(e) together to allow a debtor to request turnover of property he or she can use while allowing the creditor to respond with a request for adequate protection.[12] *In re Hall*, at 659. *See In re Quality Health Care*, 215 B.R. 543, 581 (Bankr. N.D. Ind. 1997), *appeal denied, cause remanded sub nom. Gouveia v. I.R.S.*, 228 B.R. 412 (N.D. Ind. 1998) ("However, the cases are legion, that because § 542(a) expressly refers to § 363, before a secured creditor is required to turnover property of the Debtor's estate, the Trustee must first provide the IRS with adequate protection as to lien interest."). Refusing to turn property over because the creditor is not adequately protected is not the kind of postpetition "control" that violates the stay. *Cowen*, 849 F.3d at 949.[13] Instead, a creditor wrongly withholding property may be sanctioned under the court's contempt power under section 105(a) after an order for turnover has been entered and disobeyed. *In re Cowen*, 849 F.3d at 950; *In re Hall*, 502 B.R. at 650.

i.  **The Vehicle**

The Third Circuit Court of Appeals has not addressed the issue, and the district and bankruptcy courts for the District of New Jersey have not definitively expressed an opinion.[14] For at least the last 20 years, in this judge's recollection, the practice in this district has been that a creditor holding a car repossessed prepetition may request proof of insurance naming it as loss payee prior to turnover without violating the stay. But once proof of insurance has been produced, the creditor violates the stay by not returning the car. Yet it could find no case rationalizing this. Section 362(b) does not include an exception for adequate protection. The District Court's *Carr* decision has been cited as supporting the majority opinion because it held that "the bank's failure to turn over debtor's car upon the filing of debtor's bankruptcy petition constituted a violation of

---

[12] It must be remembered that here, the Debtor's Motion was filed 3 days after the bankruptcy filing to be heard on shortened time. Creditors timely opposed the motion, effectively setting forth their counter demand for relief.

[13] "Exercise control" may be an easier concept to apply to intangible property, such as contract rights. *See In re Hall*, 502 B.R. at 665.

[14] Interestingly, in the context of the automatic stay and section 108(a), which tolls limitations periods, the Third Circuit commented "That Congress intended § 362 to prohibit only certain types of affirmative action is evidenced by the statute's language, (*i.e.*, "enforcement"; "proceeding"; "act to obtain") and by its corresponding non-utilization of terms which appropriately describe the extension or suspension of a statutory period." *Ctys. Contracting & Const. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1059 (3d Cir. 1988).

the automatic stay." *Carr v. Sec. Sav. & Loan Ass'n*, 130 B.R. 434, 435 (D.N.J. 1991). But it also stated "Security Savings was obliged to turn over the repossessed car immediately after the filing of the second petition *and the verification of insurance.*" *Id.*, at 436 (emphasis added).[15] The court sees no reason to abandon the long established practice of maintaining the *status quo* in repossessed vehicle cases until a debtor provides proper proof of adequate protection, i.e., insurance.[16]

In cases involving other types of property, New Jersey bankruptcy courts, including this court, have cited the majority position without discussion. *See In re Sussex SkyDive, LLC*, 2016 Bankr. LEXIS 1862 (Bankr. D.N.J. Apr. 27, 2016) (regarding an airplane, citing the majority in stating that "creditors have an affirmative duty to turn over property of the estate once notified of a bankruptcy filing"); *In re Stamper*, 2008 WL 724237 (Bankr. D.N.J. Mar. 17, 2008) (citing *Del Mission* and *Sharon* to sanction a failure to turn over funds paid postpetition as a violation of the stay). But those cases are distinguishable. *Sussex SkyDive* involved a landlord wrongfully exercising control over property that was clearly property of the estate and *Stamper* involved an unperfected judgment lien creditor wrongfully exercising control over property of the estate. Both cases involved creditor affirmative actions postpetition to exercise control over property of the estate, thereby affecting the *status quo* that would not have been permitted under the minority view.

In this case, this court finds the minority position particularly persuasive. That position criticizes the majority's claim that section 542(a) is self-effectuating, as it does not allow for the possibility of defenses to turnover. From the inception of this case there was an issue regarding exactly what the Debtor's interest in the Vehicle was. Only after analyzing the Contract between the parties, examining the relevant law and vetting the uncertain evidence and arguments of the parties, did the court make a determination, through this decision, of exactly what the Debtor's interest in the Vehicle was. The Debtor's interest was not readily obvious—there was a prepetition default in payments, there was a prepetition repossession, the Debtor did not have possession of

---

[15] Despite that *Carr* cites to *In re Loof*, 41 B.R. 855 (Bankr. E.D. Pa. 1984), the court in *In re Najafi*, 154 B.R. 185 (Bankr. E.D. Pa. 1993), agreed with the minority position that a debtor "must both provide adequate protection to the creditor and seek affirmative relief to obtain a turnover." *Najafi*, at 194 (*abrogated on other grounds by In re Mehta*, 310 F.3d 308 (3d Cir. 2002)). The *Najafi* court also cited *Loof* as supporting its position.

As an aside, since there was no proof at trial that the Debtor had *any* insurance at the time of filing, *see* 1T, at p. 36-39 (testifying that she did not bring proof of insurance to the plenary hearing, despite the Creditors having requested it in discovery), the court cannot fault the Creditors for not turning the Vehicle over. New Jersey requires that prior to anyone driving an automobile or motorcycle in this state, the vehicle be registered. N.J. Stat. § 39:3-4. Registration, among other things, requires proof of insurance. N.J. Stat. § 39:3-4. Minimally, a registered New Jersey driver must carry motor vehicle liability coverage. N.J. Stat. § 39:6B-1, N.J.S.A. 39:6A-3.

[16] Indeed it makes no sense to the court to require an immediate turnover of a vehicle only to have a creditor immediately turn around and file a stay relief motion due to a lack of adequate protection because of a lack of insurance especially when insurance on a vehicle is mandatory under state law and adequate protection is necessary to protect a creditor's interest in the first place. To that end, the court is mindful that the law tries to avoid absurd results. *See e.g. Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (in setoff situations recognizing: "the absurdity of making A pay B when B owes A.") (citing *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913)).

the Vehicle, the Vehicle was never titled in the Debtor's name and a Waiver was purportedly signed. It was only after the court conducted its analysis that the error of the Creditors' position came to light. During this time, the Vehicle has remained in the possession of the Creditors and no further actions against it have been taken. The *status quo* has been maintained while the court considered its decision. It would simply be unfair to declare a stay violation for not turning the Vehicle over when the Debtor's true interest in the Vehicle was unknown. *See United States v. Inslaw*, 932 F.2d at 1472 ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."); *In re Hall*, 502 B.R. at 663 ("Only upon entry of a turnover order adjudicating the estate's ownership of the property could there be a contempt for failing to turn over the property."). The Creditors will be ordered to turn the Vehicle over, but will not be sanctioned under section 362 for failing to turn it over prior to adjudication of the Debtor's right to redeem the Vehicle.

The court notes also that the Debtor did not specify under which paragraph of section 362(a) she proceeds. In her motion, she only discusses the stay as a mechanism to discontinue any pending collection proceedings and "restore the status quo as it existed at the time of the filing of the bankruptcy petition." Doc. No. 5-7, p. 3 (quoting *In re Johnson*, 262 B.R. 831, 847-48 (Bankr. D. Idaho 2001). But she did not allege that the Creditors attempted to collect on their claim against her, and it does not appear that the Creditors took any action regarding the Vehicle postpetition. Thus, sanctions are not warranted.

### ii. The Personal Property

The personal property presents a different result. There is no question that at the time of the bankruptcy filing, the Debtor had a legal right to her possessions and the Creditors had no right to that property. Unlike the Vehicle, there is no question of ownership. Indeed, the Creditors provided no basis in law for keeping this property from the Debtor and the court cannot fathom one. Certainly the Debtor could use her licenses, credit cards, and cash, in this chapter 13 case. Thus section 542(a) was applicable. The Creditors had no security interest in the property, therefore there is no issue of adequate protection, despite the Creditors' desire to protect themselves from the cost of having a new key cut. Based upon the testimony provided by the Creditors, the personal property should still be in the possession of the Creditors. No credible evidence supports their position that the personal property was returned to the Debtor and in fact, the court finds that the Creditors completely lack credibility on this point. Through their own testimony it is clear that the Creditors did not follow any of their procedures, contractual or otherwise, with regard to the return or disposition of the personal property. There is no proof that supports their version of the facts. The court is also at a loss as to why they would make the Debtor go on a wild goose chase after the bankruptcy was filed if they were certain they did not have the personal property. Indeed, suspicious.

Even though the court believes it is more likely than not that the Creditors did not return the personal property to the Debtor, the evidence does not show that the Creditors are still in possession of the personal property or were in possession of it at the time of the bankruptcy filing. The court cannot determine with certainty whether there has been a stay violation under section 362 as to the personal property.[17] Therefore, the court will order return of the personal property within seven days of the entry of this opinion. If the property is returned, the court will consider

---

[17] A return of the personal property will go to a mitigation of damages.

sanctions for a stay violation and/or contempt. If the property is not returned within that time, the court will entertain sanctions for contempt. While "[c]riminal contempt sanctions are punitive in nature and are imposed to vindicate the authority of the court . . . sanctions in civil contempt proceedings may be employed 'for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 443 (1986) (quoting *United States v. Mine Workers*, 330 U.S. 258, 302, (1947)). In so holding, the court notes that the Debtor's claim that she has been unable to work due to not having her Vehicle is a damage related to turnover of the Vehicle that the court is not sanctioning. Unless she shows that she needed those personal possessions in order to work, the loss of wages may not be part of any damages. Also, the Debtor has a duty to mitigate damages. Relatedly, the Creditors will not be allowed reimbursement or set off of their repair costs or their post-repossession storage, as these actions were done for their own benefit and/or while they were in breach of their contract.

## v. CONCLUSION

Based on the foregoing, the Debtor's Motion for Return of Repossessed Auto will be granted. Her Motion for Sanctions for Violation of Automatic Stay will be denied as to the Vehicle. The Creditors will also be ordered to return the personal property. The court reserves its opinion as to appropriate sanctions, if any, with regard to the personal property.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: October 20, 2017